1078

Jim LOWERY, Petitioner,

v.

Rondale ANDERSON, Superintendent, Respondent.[1]

No. IP 96–71–C–H/G.

United States District Court, S.D. Indiana, Indianapolis Division.

July 6, 1999.

---

1. The court has substituted as the respondent Rondale Anderson, who is petitioner Lowery's current custodian.

Monica Foster, Indianapolis, IN, Brent Westerfeld, Indianapolis, IN, for plaintiff.

Robert L. Collins, Deputy Attorney General, Indianapolis, IN, for Defendant.

## ENTRY ON PETITION FOR WRIT OF HABEAS CORPUS

HAMILTON, District Judge.

The State of Indiana has sentenced petitioner Jim Lowery to death for two murders. Lowery has petitioned for a writ of habeas corpus setting aside the murder convictions and death sentences based on alleged violations of his federal constitutional rights. After considering the parties' submissions and the extensive state court record, the court has concluded that Lowery's convictions and death sentences did not result from any federal constitutional violation. Accordingly, the court denies Lowery's petition for a writ of habeas corpus.

### Background

The State of Indiana charged Lowery in the Tippecanoe Superior Court on October 16, 1979, with two counts of murder and one count of attempted murder. The murder victims were Mark and Gertrude Thompson, both in their eighties. The victim on the attempted murder charge was Janet Brown, the Thompsons' housekeeper and caretaker. The State of Indiana filed an information alleging two counts of a capital offense and requesting a sentence of death on each count. Following a change of venue, Lowery went to trial in the Boone Superior Court. A jury found him guilty. The court sentenced him to death on the two murder charges and to 50 years in prison for attempted murder. The Supreme Court of Indiana reversed the convictions on direct appeal in *Lowery v. State*, 434 N.E.2d 868 (Ind. 1982) (*Lowery I* ) (in the absence of waiver by defendant, trial court erred by failing to sequester jury during capital trial).

On remand, after another change of venue to the Hendricks Circuit Court, Lowery was tried a second time. The jury again convicted Lowery of two murders and attempted murder. On January 7, 1983, the Hendricks Circuit Court sentenced Lowery to death on both murders and to a term of 50 years on the attempted murder conviction. The Supreme Court of Indiana affirmed the convictions and sentences on direct appeal in *Lowery v. State*, 478 N.E.2d 1214 (Ind.1985) (*Lowery II* ), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986).

Lowery later sought post-conviction relief. The state trial court denied his petition. On appeal, the Supreme Court of Indiana affirmed the denial of relief as to the murder convictions and death sentences but set aside the conviction for attempted murder based on an erroneous jury instruction on that charge. *Lowery v. State*, 640 N.E.2d 1031 (Ind.1994) (*Lowery III* ), *cert. denied*, 516 U.S. 992, 116 S.Ct.

525, 133 L.Ed.2d 432 (1995). Lowery therefore is currently under two sentences of death for the two murders of which he was convicted in the Hendricks Circuit Court and which were the subject of his direct appeal in *Lowery II*.

The victims of the murders, Mark and Gertrude Thompson, lived in rural Tippecanoe County, Indiana. Both were elderly and in declining health, and they needed help in caring for their home and for themselves. In the months before the murders, petitioner Lowery and his wife Barbara had worked as caretakers for the Thompsons and had lived with their children in a trailer that the Thompsons had provided on their property. A few weeks before the murders, the Thompsons had become dissatisfied with the Lowerys and had ordered them to leave the property.

The murders took place on September 30, 1979, at the Thompsons' home. That evening, Janet Brown, the housekeeper and caretaker, was reading in the front room of the trailer that the Thompsons provided their caretaker next to their garage. Lowery kicked open the screen door, pointed a gun at her, and told her not to move. Brown testified that she recognized Lowery immediately as a man she had met about a week earlier at the local post office. 5 R 1017–18, 1037.[2] Lowery held a pistol against Brown's neck and forced her to take him to the Thompsons' house. Outside the trailer another man joined Lowery. The accomplice was Jim Bennett, who was also charged with the murders and who testified against Lowery at his first trial.

Lowery and Brown went into the kitchen where Mark Thompson was standing. Lowery said: "This is a hold up." Mr. Thompson replied: "You don't want to do this now, Jim," calling Lowery by name. 5 R 1024. Brown saw Lowery respond by shooting Mark Thompson in the stomach.

Lowery then held the gun to Brown's head and forced her toward the den where Gertrude Thompson was watching television. Lowery ordered Gertrude Thompson to get up and move. As she was walking down the hall, he struck her in the head with the gun. She staggered and blood spurted from her head. Lowery forced both Brown and Mrs. Thompson into the kitchen. He then shot Mrs. Thompson in the head and killed her.

Lowery also shot Brown in the head, but Brown was holding her hand over her head and her wound was not fatal. At some point, Brown heard Bennett say the burglar alarm was sounding. See 5 R 1029. Mark Thompson had apparently managed to set it off. Brown then saw Lowery and Bennett get excited, and she observed Lowery go back toward Mr. Thompson. Brown heard one or two more shots. 5 R 1029–30. Later that night, after she realized that Lowery and Bennett had gone, Brown somehow managed to call for help. 5 R 1033–34. One of the shots Brown heard turned out to be a shot to Mr. Thompson's head. Mr. Thompson was still alive when police responded to Brown's call, but he died of his wounds seven days later. By the time police responded, Lowery and Bennett had fled by way of back roads.

After the shootings, Lowery and Bennett returned to the old school bus where Lowery and his family were living in a campground near Crawfordsville, Indiana. They told Barbara Lowery about the shootings. See 7 R 1515. Lowery was arrested two days later in Crawfordsville, Indiana. After his arrest, he made incriminating statements to several officers. The trial court suppressed some but not all of those statements because of *Miranda* violations. See generally *Lowery II*, 478 N.E.2d at 1218–19 (summarizing facts of the case).

---

**2.** The citation form "— R ——" refers to the volume and page number from the state court record of the proceedings in the Hendricks Circuit Court. The citation form "— PCR ——" refers to the volume and page number from the state court record of the post-conviction proceeding. The citation form "OR ——" refers to the page number from the state court record from Lowery's first trial in the Boone Superior Court.

The case against Lowery was based on three principal lines of directly incriminating evidence. First, Brown identified Lowery as the person with the gun who shot her and the Thompsons. Brown identified Lowery from a photo array while she was in the hospital recovering from her wounds. She also identified Lowery in court during the trial. Second, under a plea agreement, Jim Bennett also testified about the killings and testified that Lowery was the one who had shot the Thompsons and Brown. Third, several police officers testified about the unsuppressed statements that Lowery made shortly after his arrest in which he admitted involvement in the murders.

The prosecution also offered some additional corroborative evidence. This included testimony from Barbara Lowery (Lowery's wife at the time of the murders) that Lowery and Bennett had left the camp with a handgun and a shotgun and said they were going out on a "caper," 7 R 1511–12, then returned much later that night, very upset, shaking. In Lowery's presence, and without contradiction, Bennett told Lowery's wife "oh god, it went bad," and "oh god, he shot them right in the * * * head." 7 R 1513–15. The corroborative evidence also included a detailed account of the murders that Lowery gave to a cell-mate in the Tippecanoe County Jail. See 7 R 1721–39. In his petition, Lowery challenges each of the three principal lines of direct evidence against him.

### Lowery's Claims

Lowery asserts that his convictions and sentences resulted from violations of his federal constitutional rights. Some of his claims apply to the convictions, some to both the convictions and sentences, and some only to the sentences. Lowery has made no claim of "actual innocence" here. See 9 R 2196–97 (during penalty phase of trial, Lowery admitted shooting the Thompsons). Lowery claims his rights were violated as follows:

1. The trial court violated his Sixth Amendment right to confront the witnesses against him at the second trial when it allowed the prosecution to read as evidence Jim Bennett's testimony from the first trial.

2. The trial court violated his Fifth and Sixth Amendment rights by allowing law enforcement officers to testify about incriminating statements he made while in custody.

3. He was denied due process of law and a reliable sentencing determination by the prosecutor's misstatements of the law and evidence, and by arguments that inflamed the jury and urged the jury to render verdicts for improper reasons at both phases of the trial.

4. Under *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), he was denied due process of law and a reliable sentencing determination because the jury was told that its verdict at the penalty phase of the trial was only a recommendation to the judge, who makes the actual sentencing decision under Indiana law.

5. His constitutional rights were violated when the prosecutor requested the death penalty without intervention of a grand jury or other neutral decision-maker, at least in light of evidence that the prosecutor had been acquainted with the victims and that the victims' son was the circuit judge in the prosecutor's (and the victims') home county.

6. His constitutional rights were violated at the penalty phase when the trial judge failed to instruct the jury that Lowery was presumed innocent of the aggravating factor of committing attempted burglary and failed to instruct the jury on the elements of the crime of attempted burglary.

7. His constitutional rights were violated at the penalty phase by the trial judge's errors in considering aggravating factors and failing to consider mitigating evidence, and on appeal when the Supreme Court of Indiana reviewed the sentences.

8. He was denied his right to effective assistance of trial counsel in a number of respects during both the guilt phase and the penalty phase of the trial.

9. He was denied his right to effective assistance of appellate counsel because appellate counsel did not include in the appellate record the verbatim transcript of the jury *voir dire*.

Although Lowery invokes multiple constitutional provisions on each claim, the court will confine its discussion to the claims that were presented to the Indiana courts.

## Scope of Review

■ Lowery seeks relief in this action pursuant to 28 U.S.C. § 2254(a). A federal court may issue a writ of habeas corpus on behalf of a state prisoner only if the petitioner shows that he is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Because Lowery filed his petition before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the court applies pre-AEDPA standards to his petition.[3] Under those standards, this court must make independent and plenary judgments about the legal issues presented, rather than merely asking whether the state courts applied federal constitutional law unreasonably. See *Abrams v. Barnett*, 121 F.3d 1036, 1037–38 (7th Cir.1997); *Lindh v. Murphy*, 96 F.3d 856, 861 (7th Cir.1996) (*en banc*) (discussing legal standards both prior to and after enactment of the AEDPA). In addition, Lowery may draw on the entire body of federal case law, rather than being restricted only to decisions of the Supreme Court. *Abrams v. Barnett*, 121 F.3d at 1037–38.

**3.** The AEDPA substantially revised the standards that federal courts apply to petitions under § 2254, but the new legislation does not apply to petitions filed before its enactment. See *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Lowery filed his petition before enactment of the AEDPA. After the principal briefing was

## Discussion

### I. Admission of Bennett's Prior Testimony

At Lowery's first trial, Jim Bennett testified for the prosecution pursuant to a plea agreement that provided for a 40–year sentence for Bennett's role in the crimes. Before the retrial, Bennett told the prosecution that he would not testify against Lowery at the second trial unless he got a better deal. The prosecution refused to sweeten the deal. After some maneuvering described below, the prosecution called Bennett as a witness at the retrial. Bennett refused to testify. The trial judge found Bennett in contempt, but he still refused to testify. At that point, over Lowery's objection, the court allowed the prosecution to read to the jury Bennett's testimony from the first trial. See 8 R 1764.

Lowery contends the use of Bennett's prior testimony denied him the right to confront and cross-examine a critical witness against him in violation of the Sixth Amendment. Lowery contends that Bennett was not "unavailable" at the second trial because the prosecution could have and should have made more vigorous efforts to pressure Bennett to testify.

■ The right of an accused individual to test the accuracy of adverse testimony is an essential safeguard in the American adversarial system of criminal justice. See, *e.g.*, *Ohio v. Roberts*, 448 U.S. 56, 63–65 & n. 6, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Nevertheless, the Sixth Amendment confrontation clause "permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial." *Maryland v. Craig,*

completed, however, the Seventh Circuit held that the new act applied to pending petitions. *Lindh v. Murphy*, 96 F.3d 856, 867 (7th Cir. 1996) (*en banc*). After the Supreme Court reversed the Seventh Circuit's decision in June 1997, the parties had the opportunity to file supplemental briefs.

497 U.S. 836, 847–48, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (citing cases). Where prior testimony of a witness is admitted at a later trial because the witness is unavailable to testify, the confrontation clause requires that the defendant must have had an opportunity to cross-examine the witness at the earlier proceeding sufficient to endow the testimony as a whole with substantial "indicia of reliability" so that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement." *Mancusi v. Stubbs,* 408 U.S. 204, 216, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972), quoting *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (internal quotation marks omitted).

■ The problem of unavailable witnesses arises most often when a witness is physically unavailable for trial by reason of death, illness, or distance. But a witness may also be "unavailable" for these purposes where the witness simply refuses to testify despite a court order to do so, backed up with sanctions for contempt of court. See, *e.g., Crespin v. New Mexico,* 144 F.3d 641, 646 (10th Cir.1998) (parties agreed co-defendant was unavailable to testify when she refused to testify at trial despite being held in contempt). Similarly, under the Federal Rules of Evidence, a witness is "unavailable" so as to permit use of former testimony if the witness "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." Fed.R.Evid. 804(a)(2).

■ Bennett's refusal to testify at Lowery's second trial was neither anticipated nor procured by the State. Bennett's testimony at Lowery's first trial was fully subject to cross-examination by Lowery's counsel. Lowery does not contend that the cross-examination was not full and meaningful. The issue, therefore, is whether Bennett was truly "unavailable" for the second trial.

■ The Supreme Court has repeatedly said that, before prior testimony can be used on the theory that the witness is unavailable, the prosecution must demonstrate that it has made a good faith effort to obtain the witness's testimony in person before the trier of fact. *Ohio v. Roberts,* 448 U.S. at 74, 100 S.Ct. 2531; *Mancusi v. Stubbs,* 408 U.S. at 210–11, 92 S.Ct. 2308; *California v. Green,* 399 U.S. 149, 161–62, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *Barber v. Page,* 390 U.S. 719, 724–25, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) (fact that witness was in federal custody in another state did not justify use of prior testimony where prosecution made no effort to obtain his presence for trial).[4]

The problems with Bennett arose after he had been transported from a state prison to a county jail to be available for testimony at Lowery's second trial in Hendricks County. On November 28, 1982, he informed a prosecutor and sheriff's deputy that he thought he had complied with his plea agreement by testifying at Lowery's first trial and that he would testify at the second trial only if his sentence were reduced further to a maximum of ten years. 5 PCR 1093–95. Later that night, in a follow-up interview, Bennett told law enforcement officers that he intended to testify that Lowery had not been present when the murders were committed.

A few days later, on December 3, 1982, after the jury had been sent home for the day, the court held a hearing in which Bennett was called to the stand. A state public defender appeared as counsel for Bennett at the hearing. See 5 R 1156. Bennett initially refused to be sworn, but he later complied. 5 R 1157, 1159. Bennett stated his intention not to testify even if ordered to do so by the court. 5 R 1161–67. He said that he understood he had no Fifth Amendment right not to testify and that his lawyer had explained to him the possible consequences of not testifying. 5 R 1164, 1169–71. He also made

---

**4.** This line of cases under the Sixth Amendment rebuts the respondent's effort to cast this issue as merely a matter of the state evidence law.

it clear that the prosecutor was not trying to keep him from testifying. 5 R 1162. When the judge gave Bennett a chance to explain himself, he told the judge he felt he did not have to testify because he had already testified once. 5 R 1185.

The judge then threatened to hold Bennett in contempt and to order his plea bargain revoked. 5 R at 1186. After some fits and starts in which Bennett initially answered a few questions, he again refused and the judge held him in contempt of court. 5 R 1191. The judge also instructed the prosecution to consider revoking Bennett's plea bargain and recommended that the prosecution proceed to seek the death penalty against Bennett. 5 R 1191–92. The judge also recommended that the Department of Correction give Bennett no good-time credits so long as he remained in contempt. The lawyer representing Bennett, however, objected that the Hendricks Circuit Court did not have jurisdiction to take any action against Bennett other than to hold him in contempt of court. 5 R 1194–95. The court and all parties agreed on that point. The judge then rescinded the orders or recommendations concerning Bennett's plea bargain and his good-time credits. 5 R 1195–97.

Three days later, Bennett appeared with counsel, again outside the presence of the jury. 7 R 1590. Bennett testified that in the interim he had changed his mind and had decided to testify, had then changed his mind again, and would still refuse to testify. 7 R 1591. Bennett persisted and again was held in contempt. 7 R 1594. The judge told Bennett that he was "making a mockery of justice" and that the judge would do everything he possibly could to see that the original charges were again filed against him. *Id.* Later that afternoon, the prosecution called Bennett as a witness, this time in the presence of the jury. Bennett again refused to testify, and the court again held him in contempt. 7 R 1654–59. The next day the court determined that Bennett was unavailable as a witness and permitted the prosecution to read to the jury the transcript of Bennett's testimony at the first trial.

During his post-conviction proceeding, Lowery expanded the record to show that the prosecution had not made any additional threats of prosecution or punishment against Bennett beyond the punishment for contempt of court; that Bennett had agreed to testify when he thought he would be risking additional prison time and possibly the death penalty if he refused and if his plea bargain had been revoked; but that after he learned from his attorney that the penalty for contempt of court was three months in jail and a $500 fine, he again refused to testify. The Supreme Court of Indiana said in its opinion that "Bennett had been amenable to threats of further prosecution, but no such threats had been made by the State." *Lowery III,* 640 N.E.2d at 1037.

Lowery argues here that, because additional threats would have persuaded Bennett to testify at the second trial, the prosecution's failure to make those threats amounted to a failure to make a good faith effort to obtain his testimony. Lowery bases this argument on two pillars: first, that the trial court proceedings showed the prosecution that further threats would persuade Bennett to testify, see Pet. Reply Br. at 11–12; and second, that state law required the prosecutor to pursue new criminal charges against Bennett, *id.* at 12–14, citing Ind.Code § 33–14–1–3. Lowery contends that the prosecutor could have sought "a judicial interpretation" of Bennett's plea agreement in Howard County, could have charged Bennett with obstruction of justice under Ind.Code § 35–44–3–4(a)(2)(A), could have sought to have him punished as a habitual criminal, and could have sought revocation of Bennett's plea agreement. If the plea agreement had been revoked, Bennett could have faced a maximum sentence of either death or 170 years imprisonment on the original charges of murder and attempted murder.

Lowery's argument based on the good faith requirement of *Ohio v. Roberts* seems to be that, if it is possible to identify any

additional measures that would have been reasonable to take to obtain the witness's testimony, then the failure to take those steps shows that the witness was not unavailable. See Pet. Reply Br. at 12. That clearly is not the approach adopted in *Ohio v. Roberts*. In that case the key prosecution witness was a girl who apparently had run away from home after she testified at a preliminary hearing. Five subpoenas and four different trial dates produced nothing. The girl's mother testified that she and her father did not know where the girl was and did not know how to get in touch with her even in an emergency. 448 U.S. at 59–60, 100 S.Ct. 2531. The state trial court held that the witness was unavailable and admitted her prior testimony.

The Supreme Court of the United States held that the prosecution had shown the witness was unavailable. *Id.* at 75, 100 S.Ct. 2531. The Court recognized that the prosecutor might have taken other steps, including following up on a lead from a social worker in San Francisco, but held that more was not required as a matter of constitutional law: "One, in hindsight, may always think of other things. Nevertheless, the great improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution." *Id.* at 75–76, 100 S.Ct. 2531; but see *id.* at 79–80, 100 S.Ct. 2531 (Brennan, J., dissenting) (arguing that further efforts to locate witness might have been successful and should have been required before admitting testimony from the preliminary hearing).

Similarly, in *Mechler v. Procunier*, 754 F.2d 1294 (5th Cir.1985), the only eyewitness to the murder testified at a preliminary hearing and then left the state. Applying *Ohio v. Roberts* and *Barber v. Page*, the Fifth Circuit held that the prosecution had shown adequate good-faith efforts to locate the witness by issuing three subpoenas in Texas (although the witness had said she was leaving the state) and by twice seeking assistance from Illinois authorities after the witness had telephoned the Texas prosecutor and told him she lived in Illinois. Illinois authorities were unable to locate and serve her with a subpoena. Texas authorities had also arranged to pay the witness's travel expenses. 754 F.2d at 1297. It is easy to imagine that the Texas authorities could have taken additional steps to locate the witness, but the Fifth Circuit held that the unsuccessful efforts they made were reasonable and sufficient to allow use of the testimony from the preliminary hearing.

In *United States v. Allie*, 978 F.2d 1401, 1406–08 (5th Cir.1992), the Fifth Circuit held that the government had made reasonable efforts to have alien witnesses return to the United States to testify at trial. Those efforts included giving the witnesses the option of remaining in the United States with work permits, telling the witnesses they could be paid witness fees and travel costs; giving each witness a subpoena and a letter to facilitate reentry into the United States, calling the witnesses in Mexico, getting the witnesses' repeated assurances that they would return, apprising the border inspectors of the witnesses' expected arrival, and issuing checks to be given to the witnesses upon their reentry into the United States. Could more have been done to ensure that the witnesses would testify at trial? Almost certainly, but the record showed a reasonable and good faith effort to secure the witnesses' presence at trial, so they were properly deemed unavailable at trial. See also *United States v. Kehm*, 799 F.2d 354, 360–61 (7th Cir.1986) (witness in Bahamas was unavailable where United States had no extradition treaty and witness was unwilling to testify voluntarily without transactional immunity; *Ohio v. Roberts* did not require prosecution to take futile steps to secure attendance); *Buelow v. Dickey*, 622 F.Supp. 761, 763–64 (E.D.Wis.1985) (witness was unavailable where she refused to testify despite being held in contempt), *rev'd on other grounds*, 847 F.2d 420 (7th Cir.1988).

By contrast, Lowery has not identified any cases in which prosecution efforts comparable to or greater than those made here were deemed insufficient to show a witness was unavailable, nor has he identified cases holding that the ability to identify additional steps the prosecution might have taken to secure the testimony is sufficient to undermine the prosecution's assertion that it has made a reasonable, good faith effort. Cf. *Sherley v. Seabold*, 929 F.2d 272, 274 (6th Cir.1991) (state failed to show reasonable efforts to secure testimony of elderly witness in nursing home where state simply deferred to wishes of family and treating physician that she not be asked to testify, and state also failed to try to take her deposition); *United States v. Quinn*, 901 F.2d 522, 528 (6th Cir.1990) (government failed to show reasonable efforts to locate witness; prosecution had waited until less than five days before trial to subpoena its "unavailable" witness, and then made only negligible efforts to locate her).

■ The issue under the unavailability prong of the *Ohio v. Roberts* test is whether the prosecution made a reasonable effort in good faith, not whether it made all reasonable efforts. Lowery's argument on this point essentially adopts the position of the dissenting justices in *Ohio v. Roberts*, see 448 U.S. at 79–80, 100 S.Ct. 2531, but this court must apply the test adopted by the Court majority:

> The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." *California v. Green*, 399 U.S. at 189, n. 22, 90 S.Ct. 1930 (concurring opinion, citing *Barber v. Page, supra*). The ultimate question is whether the witness is unavailable despite good-

faith efforts undertaken prior to trial to locate and present that witness.

448 U.S. at 74, 100 S.Ct. 2531 (emphasis in original).

In this case, the prosecution brought Bennett to trial to testify. After Bennett balked in an attempt to extort a better deal from the State, the prosecution had him held in the local jail, repeatedly tried to persuade him to testify, and repeatedly called him before the trial judge. The judge repeatedly held him in contempt for refusing orders to answer questions. Those efforts were unsuccessful. The fact that other steps the prosecution did not take might also have been reasonable does not show either that it failed to make a reasonable, good faith effort to secure Bennett's testimony, or that Lowery's Sixth Amendment rights were violated by use of Bennett's testimony from Lowery's first trial.

■ Lowery also argues that the prosecutor failed to make a reasonable, good faith effort to obtain Bennett's testimony because the prosecutor failed to fulfill a mandatory duty to prosecute for a crime that came to his attention. To support this argument, Lowery relies on Ind.Code § 33–14–1–3, which describes a prosecutor's duties upon receiving information about the commission of a crime. There is no mandatory duty under state law to prosecute a crime. Such decisions are left to the judgment and discretion of the prosecuting attorney, without interference by the courts. See *Johnson v. State*, 675 N.E.2d 678, 683 (Ind.1996); *Lamotte v. State*, 495 N.E.2d 729, 733 (Ind.1986). The Indiana statute adds nothing to Lowery's argument on this claim.

■ Further, based on a review of the entire state court record, the court finds that even if the use of Bennett's prior testimony had violated Lowery's Sixth Amendment rights, he would not be entitled to relief on that basis because any error would have been harmless. The goal of the Sixth Amendment's confrontation

clause is to promote discovery of the truth. Lowery himself has admitted the most salient facts that Bennett stated in his testimony: that Lowery intended to rob the Thompsons and that Lowery fired the shots that killed them. See 9 R 2196–2201. Another trial to give Lowery another opportunity to try to persuade a jury to entertain a reasonable doubt about facts he has admitted and that are no longer subject to reasonable dispute would not be warranted.

## II. *Admission of Inculpatory Statements Made While in Custody*

After Lowery was arrested, he was given his *Miranda* warnings. Lowery told the police that he wanted to remain silent and did not want to waive his *Miranda* rights. Nevertheless, several officers engaged Lowery in conversation and asked questions related to the murders of the Thompsons. Lowery made incriminating statements in response. The trial court suppressed Lowery's statements to Crawfordsville Police Chief Goode and Officers Chase and Worthington while he was in custody in the Montgomery County Jail, concluding they were the results of unlawful interrogation. See 3 R 609; see also OR 271. But the trial court refused to suppress other incriminating statements that Lowery made to Crawfordsville Police Officer Michael Bridge, Indiana State Police Sergeant George Ross, and Tippecanoe County Sheriff's Department Lieutenant Chase, finding that those statements did not involve any interrogation by the police. See *Lowery II*, 478 N.E.2d at 1221–22 (summarizing the statements).

Officer Bridge testified that Lowery said "he did it," and that he "did it because he uh, hated Mr. Thompson and uh, that Mr. Thompson had uh, in his words, ripped off, people with his law practice...." 5 R 1135. Bridge testified that Lowery volunteered these comments when the two were alone, and not in response to any questions by Bridge. *Id.* Lowery also told Bridge that Bridge "would be a hero for catching him and that he [Lowery] would be famous in the papers like Roger Drollinger." 5 R 1136. Lowery also told Bridge that he was upset with Mr. Thompson because he had kicked Lowery and his family out, and that "he knew he was in trouble when he had heard on the radio that uh, the housekeeper had survived." *Id.*

Sergeant Ross testified that Lowery initiated a conversation with him when Ross was in the Tippecanoe County Jail on unrelated business on October 9, 1979. The testimony continued:

Q He-he initiated it, he asked you if you could stay?

A Yes, he did.

Q Ok, go ahead.

A Which I did, uh, and told him I couldn't talk anything about the case and he said it wouldn't matter anyway even if we did because his lawyer wasn't present and it couldn't be used.

Q Ok, then did he say something to you?

A Yes, he did.

Q What did he say to you?

A He uh, he said he'd heard that on the street that uh, the word on the street was that uh, he was as big or bigger than Charles Manson in the area.

Q Did he say anything else to you?

A Yes. He did. Uh, he told how he'd uh, shot Mark Thompson in the side however, he said he did not shoot the women. And uh, talked about being uh, in an institution, a mental institution when he was sixteen years old.

Q Ok, do you recall anything else he said to you?

A He said uh, just about, he had been through Beatty Memorial and Logansport Mental Institutions and that his attorneys were attempting

to get those records to uh, show him to be insane.

7 R 1638–39.

Lieutenant Chase of the Tippecanoe County Sheriff's Department sat in the back seat of a car with Lowery when he was transported from Crawfordsville to Lafayette on October 2, 1979. Chase testified that Lowery volunteered some information to him. Chase testified that Lowery said "his partner had brought the guns to the Thompson residence and that he had fired one shot," and that "a siren had scared them off, his partner had brought the guns and had taken them back with him," and that "he was not concerned about telling us who his partner was uh, because he didn't care if someone else got shot, not even if it was a policeman." 8 R 1915. Lowery also told Chase "that he thought he would probably get the electric chair" but was hoping to get "natural life instead." 8 R 1915–16.

The trial court admitted the evidence of those incriminating statements to Bridge, Ross, and Chase after concluding that they did not result from custodial interrogation. Lowery contends that all the statements should have been suppressed because they were merely a continuation of the improper interrogation that had already occurred. Chase had been part of the earlier improper interrogation at the jail. See 8 R 1913–14; OR 218–20 (Tippecanoe County Lieutenant Worthington testified that some things Lowery said in the car were things he had discussed with Chief Goode, Chase, and Worthington at the police station, and Chase had asked most of the questions).

■ The Sixth Amendment, as interpreted in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), generally prohibits the use of evidence obtained in custodial interrogation after the suspect has requested the assistance of counsel. See also *McGowan v. Miller*, 109 F.3d 1168, 1175 (7th Cir.1997). Relying on language in *Rhode Island v. Innis*, Lowery argues that use of his statements to

Bridge, Ross, and Chase violated his rights because the conversations were the "functional equivalent" of interrogation. The Supreme Court said in *Innis:*

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

446 U.S. at 300–01, 100 S.Ct. 1682 (footnotes omitted); see also *Killebrew v. Endicott*, 992 F.2d 660, 663 (7th Cir.1993).

■ Lowery was in custody when he made all the relevant statements. The only disputed issue is whether his incriminating responses were responses to "interrogation" or whether they were instead statements that he volunteered. The police improperly interrogated Lowery despite his statement that he wished to remain silent. Nevertheless, the fact that interrogation has begun does not invariably mean that all further communication between an arrestee and police was the product of improper interrogation. Thus,

> statements that are volunteered by an individual while in custody are not subject to exclusion from evidence under *Miranda*. See, e.g., *United States v. Edwards*, 885 F.2d 377, 385 (7th Cir. 1989). Indeed, in *Miranda* itself, the court stated very clearly that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." [384 U.S.] at 478, 86

S.Ct. 1602; *see also Innis,* 446 U.S. at 300, 100 S.Ct. 1682.

*McGowan v. Miller,* 109 F.3d at 1175.

The line between continued interrogation and a conversation in which the arrestee volunteers incriminating statements may be a fine one in some cases, as *Rhode Island v. Innis* shows. In that case the defendant had been riding in a police car with three officers. The police suspected the defendant had been involved in crimes using a sawed-off shotgun that had not been located. Two of the officers began talking about the risk that the missing shotgun might pose to handicapped children at a nearby school. The defendant responded by telling the officers to turn the car back so that he could show them where the shotgun was hidden. 446 U.S. at 294–95, 100 S.Ct. 1682. The Supreme Court held that the defendant had not been subjected to interrogation, so that his incriminating admissions and disclosures could be used against him. *Id.* at 302, 100 S.Ct. 1682.

 The state courts found here that Lowery's incriminating statements were not made in response to interrogation. Those findings are presumed correct unless they are without support in the record. *E.g., McGowan,* 109 F.3d at 1175 (applying pre-AEDPA standard and upholding admission of suspect's statements that state courts had determined to have been volunteered to police officer while riding in police car). Lowery has not shown that the state courts' view of the situation was factually erroneous or was based on a misunderstanding of the applicable constitutional standard.

The treatment of Lowery's statements here is similar to the situation in *McGowan.* See also *Andersen v. Thieret,* 903 F.2d 526, 531–32 (7th Cir.1990) (suspect in custody said "I stabbed her," and court held the statement was admissible regardless of whether *Miranda* warnings had been given because defendant volunteered statement without any interrogation). The statements admitted at trial were not the product of improper interrogation. Their use at trial did not violate Lowery's constitutional rights.

### III. *Asserted Prosecutorial Misconduct*

 Lowery contends that he was denied due process at both the guilt phase and at the penalty phase due to prosecutorial misconduct. In evaluating a claim of prosecutorial misconduct as a violation of the petitioner's due process right to a fair trial, the inquiry is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "[T]he well-settled standard of review [is] that we are to consider the prosecutor's conduct not in isolation, but in the context of the trial as a whole, to determine if such conduct was 'so inflammatory and prejudicial to the defendant ... as to deprive him of a fair trial.'" *United States v. Chaimson,* 760 F.2d 798, 809 (7th Cir.1985), quoting *United States v. Zylstra,* 713 F.2d 1332, 1339 (7th Cir.1983). The test for fundamental unfairness is whether there is a reasonable probability that the errors changed the outcome of a case. See *United States v. Falk,* 605 F.2d 1005, 1011 (7th Cir.1979) (applying *Donnelly v. DeChristoforo* ).

 A. *State's Opening Statement.* The first instance of asserted prosecutorial misconduct at the guilt phase occurred during the State's opening statement, when the prosecutor stated to the jury that they would hear testimony from Janet Brown. The prosecutor told the jury that the police officers would testify that when she heard Lowery's name at the hospital the night of the shootings, "she sat straight up in bed and had goose flesh all over her and you will almost be able to hear that on the tape," and that, although considerable time had passed since the night of the shootings, the prosecutor predicted that the jury would "see fear still.

Even though there is a Judge and a jury in between, you will still see fear." 4 R. 943–44.

Brown's demeanor when the police interviewed her and when she identified Lowery shortly after the shootings was certainly relevant. Brown's demeanor on the witness stand several years after the shootings was also relevant evidence. The prosecutor's statement was a description of the evidence which the prosecutor intended to present and a characterization of one aspect of Brown's demeanor which the prosecutor believed the jury would perceive. This statement was not improper.

B. *State's Final Argument.* Lowery contends that the prosecutor also transgressed the bounds of fairness in various ways during the State's closing argument at the guilt phase. One such occasion was the following statement:

As you have seen, we have gone through a lot to get here. I have gone through a lot. To be able to stand here and tell this man to his face, as the evidence shows plainly that he is a murderer. To ask you to do your duty, to convict him as such. The Thompson's [sic], Janet and Mark and Gertrude, the Thompson's [sic] and their caretaker were harmless, they were helpless, they were defenseless and he put a gun to their heads and he pulled the trigger. And that is why he picked them. Because they were helpless and harmless and defenseless. Men who do things like that don't believe in giving anybody a chance. Not one chance. Let alone a second. Mercy is not in the vocabulary of somebody like that. And it is no accident that on the day of his arrest, he was talking about getting his name in the paper like Drollinger, it is no accident that days later he was telling Sergeant Ross that he heard he was bigger than Manson.

8 R 1958. The prosecutor also referred to the photographs of the crime scene:

And undoubtedly Mark was standing there at that time and he set off the siren, watching, you can imagine how he must have felt, his wife being shot (Mr.

Meyers not speaking into microphone, extremely hard to pick-up or understand.) (MR. MEYERS SHOWING SLIDES PREVIOUSLY SHOWN). This is what he did. She had absolutely no way to help herself, these killings had nothing to do with the robbery. These murders were for the fun of it. This is probably, this horrible photograph is anybody could ever look at. But you can see what his handiwork was.... You can see where he was laying and the blood was pulsating from his head.... Unfortunately in murder cases the evidence is unbelievable [sic] horrible. I don't think I have ever seen like that.

8 R 1961–63.

▆▆▆ These comments did not deny Lowery a fair trial. These were comments on the evidence and the nature of the crimes. The references to Charles Manson and Drollinger (who was apparently another convicted murderer well-known in the area at the time) came from Lowery himself in his comments to Sergeant Ross, and the jury had heard evidence of those statements. The comment on the photographic evidence as "horrible" was understandable and not improper. The further comment that the photographs were worse than the prosecutor had seen before was not proper, but it was not so serious as to deny Lowery a fair trial. There is no serious factual issue of guilt or innocence here. Also, the judge warned the jury more than once that counsel's arguments were not evidence, and juries tend to take such arguments with a substantial grain of salt.

▆▆▆ Lowery also contends the prosecutor told the jury that the presumption of innocence did not apply to him. "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). In the comments in dispute, the prosecutor told the jury:

We have a interest in seeing that the rest of us are protected from criminals. We have a interest in seeing that the guilty are convicted. We have no interest at all in seeing that the guilty are found not guilty. Would it make any sense that we would write a law for ourselves that would say that a juror could believe that a man was guilty and still find him not guilty? Would that make any sense? Every once in awhile you will hear a juror who gets very confused on the question of reasonable doubt and he will say, well, I believed he was guilty but, you didn't prove it. A juror like that simply does not understand what he was supposed to be doing, what he was supposed to be asking himself. And why? It may very well be that we can't prove a man guilty, but, what is a jury going to say when he thinks about a case and he asks himself, do I really doubt that he is guilty? He is going to say to himself, I don't know. He is going to himself, I really doubt that he is guilty. If he says to himself, if he looks inside himself and thinks about the evidence and he says, I believe he is guilty, then he is. There is a very old rule of law about the presumption of innocence. Along these lines, I am just going to make this one more point, and then I am going to stop lecturing on this, it is very important that nobody here gets confused on this, the presumption of innocence is a device we use to tell jurors to keep their minds open till all the evidence is in. It is just the opposite side of the coin, to proof beyond a reasonable doubt. And there is an old principle that goes along with that says, and really puts this completely in focus, that the presumption of innocence is a rule [devised] to protect the innocent as far as humanly possible and not designed to protect the guilty from merit of punishment.

8 R 1972–73. These comments were not improper. They reflect an argument by the prosecutor that the presumption of innocence had been rebutted. Even if this argument went too far, it did not deny

Lowery a fundamentally fair trial. As noted above, the judge properly instructed the jury that the statements of counsel were not evidence and that the court would instruct the jury concerning the law. The evidence of guilt was overwhelming and is not disputed here as a factual matter.

■ The remaining challenges to the prosecutor's comments at the guilt phase of Lowery's second trial are not persuasive. The prosecutor commented on the testimony of Danny Harrison, a prison inmate who testified about statements Lowery made in jail. In doing so, the prosecutor did not unduly suggest that Lowery should be feared. Similarly, the prosecutor stated that he was present in the courtroom for Mark Thompson, for Gertrude Thompson and for Janet Brown and was asking for justice from the jury, for the jury to do their duty and to "tell Jim Lowery he is not going to get away with murder." 8 R 1996. This characterization of the prosecutor's role was not improper. The prosecutor did not imply to the jury that he had knowledge of the crimes beyond what had been shown by the evidence, and he did not appeal to any inference that was not relevant to the issues in the trial or not supported by the evidence. Cf. *United States v. Young*, 470 U.S. 1, 7–8, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (counsel should not assert or imply personal knowledge beyond the evidence, nor assert personal opinion about the case, but may argue counsel's analysis of the evidence). The court reads the prosecutor's statements not as an argument to convict based on fear or public pressure, but as an argument to convict because the evidence powerfully showed Lowery was guilty of murdering the Thompsons. That was proper.

■ C. *State's Argument at the Penalty Phase.* Lowery contends that it was error for the prosecutor to inform the jury that two aggravating circumstances under the death penalty statute—commission of another murder, and murder in attempting

to commit burglary—had already been found beyond a reasonable doubt through the jury's verdict at the guilt phase. The prosecutor's statement was not error, for the jury had found Lowery guilty of two murders during a single episode (thus escaping the difficulty of identifying aggravating factors from separate episodes noted in *State v. McCormick,* 272 Ind. 272, 397 N.E.2d 276 (1979)). Lowery does not cite any constitutional basis for his argument that this argument unfairly inflated the double murder at the penalty phase.

 Lowery points out that the prosecutor misstated the law at the end of the State's opening statement in the penalty phase when he stated that the jury would find that the aggravating circumstances "are not outweighed by any mitigating circumstances which might be argued to exist in this case." 9 R 2056. Indiana law puts the burden of proof on the prosecutor and requires the jury to determine whether the aggravating circumstances outweigh the mitigating circumstances. Ind.Code § 35–50–2–9(e)(2) & (k); *Harrison v. State,* 659 N.E.2d 480, 482 (Ind.1995). The court properly instructed the jury on this point, and there is no reason to think that the jury failed to understand and follow those instructions. The prosecutor's misstatement on this point of law does not warrant habeas relief.

Lowery also argues that the prosecutor made improper remarks in the closing argument at the penalty phase by appealing to the jury's passions and prejudice. First, Lowery points to remarks in the closing argument at the penalty phase, delivered about two weeks before Christmas, where the prosecutor said that the Thompsons' son would be unable to spend Christmas with his parents. 9 R 2237. He also said that Lowery had received more due process than he had given the Thompsons. 9 R 2248.

Second, Lowery complains about the prosecutor's comments in his rebuttal concerning his acquaintance with the Thompsons:

Mr. Giddings said uh, state's attorney didn't know Mark Thompson, I knew him personally. I practiced law with him. And you heard what he was like. You heard this evidence. He was warm, he was humorous, he was intelligent. He was a prosecutor back in prohibition days. In Lafayette. He and his wife are fine people and everybody liked them.

9 R 2264–65. These comments must be understood in context. In the defense closing argument at the penalty phase, defense counsel had argued:

Nothing I say to you now, nothing I do can bring these people back. Nothing we can say here can give back the lives of Mark and Gertrude Thompson. I did not know Mark Thompson, *the State's attorneys did not know Mark Thompson.* I know he was an attorney, I don't know if he were standing here today if he would ask you for the death penalty for that man, I don't know whether he would or not. I did not know Mrs. Thompson and I don't know if she would ask you that.

9 R 2256. (emphasis added).

 The comments on the loss suffered by the victims' family and community were fair comment on the victims' deaths and their significance, a matter that is relevant to the constitutionally valid consideration of retribution in sentencing. There is no blanket prohibition on the jury considering such factors. See *Payne v. Tennessee,* 501 U.S. 808, 826–27, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The prosecutor's comment about being personally acquainted with the Thompsons was irrelevant and improper, although it was an understandable response to the incorrect statement by defense counsel. In the context of the entire penalty phase, this statement was not so prejudicial as to render the proceeding fundamentally unfair. Viewed as part of the prosecution's entire argument, which otherwise related to legitimate sentencing concerns such as Lowery's past criminal history, his mental com-

petence, and the nature of the crime, the improper statement was brief and was highly unlikely to have affected the outcome of the penalty phase.

Lowery is not entitled to relief based on any asserted prosecutorial misconduct.

## IV. *Caldwell v. Mississippi and the Jury's Role at the Penalty Phase*

 A death sentence may not be based on "a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi,* 472 U.S. 320, 328–29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Lowery claims that he was denied due process and a reliable sentencing determination because the jurors were told that their role at the penalty phase was to make a recommendation to the trial judge, who would make the final sentencing decision, and because jurors were not told the judge would need to give their recommendation any important weight or consideration.

 In *Caldwell v. Mississippi,* where the jury made the decision to impose the death penalty, the prosecutor had argued that the jury's decision "is not the final decision" and that its decision would be "automatically reviewable" by the state's supreme court. When the defense objected, the trial judge had told the jury that its verdict would be "reviewable automatically." 472 U.S. at 325–26, 105 S.Ct. 2633. The Supreme Court of the United States held that these comments required reversal because the suggestion that "the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." *Id.* at 333, 105 S.Ct. 2633.[5]

 *Caldwell* applies only where the jury is misled about its role in the sentencing process in a way that allows it to feel

less responsible for the sentencing decision than it actually is. This is clear from the majority/plurality opinion in *Caldwell,* from Justice O'Connor's concurring opinion, and from later comments by the Court in *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989); *Darden v. Wainwright,* 477 U.S. 168, 183–84 n. 15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); and *Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). That is, to violate the principles of *Caldwell,* the remarks to the jury must describe inaccurately the role of the jury under state law.

 Indiana law provides that in a capital jury trial, the jury makes a recommendation to the judge as to whether the death penalty should be imposed. The judge must consider the jury's recommendation, but the final decision is the judge's. Ind.Code § 35–50–2–9(e). The Seventh Circuit recently addressed the application of *Caldwell* to the jury recommendation procedure in Indiana in *Fleenor v. Anderson,* 171 F.3d 1096 (7th Cir.1999), *affirming Fleenor v. Farley,* 47 F.Supp.2d 1021 (S.D.Ind.1998). In *Fleenor* the jury was told repeatedly and correctly that its decision would be a recommendation. The trial judge instructed the jury that its recommendation would be "a very valuable contribution" to the sentencing process. See 47 F.Supp.2d at 1031. In closing argument in the penalty phase, the prosecutor in *Fleenor* emphasized the jury's advisory role. See 171 F.3d at 1099.

The panel majority in *Fleenor* found no *Caldwell* violation (and thereby affirmed this court's conclusion on the same issue). The majority expressed doubts about whether *Caldwell* could properly be applied at all to the jury recommendation process where state law did not require the trial judge to give the jury's recommendation any particular weight, but the majority decided the case on the assump-

---

**5.** *Caldwell* was decided while Lowery's case was still on direct review, so he is entitled to rely on the principles announced there, at least to the extent they may apply here. See

generally *Sawyer v. Smith,* 497 U.S. 227, 241–45, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990); *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

tion that *Caldwell* could be applied. See 171 F.3d at 1098–99. In dissent, Judge Ripple argued that, under the totality of the circumstances, the jury had been misled. Judge Ripple focused in part on the line of Indiana cases (discussed below) deciding the weight a jury's recommendation must be given by the trial court and the Supreme Court of Indiana, and he concluded that the jury should have been told that if it did not recommend the death penalty, "that recommendation would have constituted a high hurdle for the state to overcome before the state trial judge would have imposed the death penalty." 171 F.3d at 1105 (Ripple, J., dissenting).

To apply the principles of *Caldwell*, the court first reviews the relevant comments and then analyzes them in terms of their accuracy as a matter of Indiana law. During the jury selection process, the trial judge told the prospective jurors:

> In Indiana, after the trial of a case, if a defendant is found guilty, then another hearing is held before the jury, where the parties have an opportunity to present aggravating and mit [sic], evidence of aggravating and mitigating circumstances in the case and then the jury again retires to make a recommendation to the court from the jury whether they recommend the death penalty. It's not the function of a jury to sentence a defendant. It is solely the responsibility of the Judge, me, and the Judge must make the final decision. The jury's opinion is merely a recommendation to me.

PCR Ex. 28 at 48. The judge made other similar comments during *voir dire*. See, *e.g., id.* at 135, 334–35, 514. The *voir dire* by the prosecutor repeatedly used the term "recommend" in asking prospective jurors whether they would be willing to consider the death penalty if the case reached the penalty phase. Lowery points out that two jurors who actually served on the jury indicated that the jury's role in making a recommendation would make a difference to them:

Prosecutor: All right. You think the death penalty law is a good law?

Ms. Shrum: Yes.

Prosecutor: If you felt the circumstances were warranted, could you come out in open court and face the person and tell him number one you found him guilty of murder, and number two if you found it was, war, warranted by the circumstances, come back, face that person, and tell them you found them uh, that they merit the death penalty, that you'd recommend that?

Ms. Shrum: Yes.

Prosecutor: All right. Does it make any difference to you that you recommend and don't actually sentence the person to the death penalty?

Ms. Shrum: Yes.

 * * * * * *

Prosecutor: ... Could you consider evidence and render a verdict regarding the death penalty in this case? Does it make any difference to you that you only recommend?

Ms. Jamison: Yes, it would make a difference.

Prosecutor: Okay. How does that make a difference to you, why's that make a difference?

Ms. Jamison: Guess I would feel the Judge had the final say.

Prosecutor: Okay. Do you, you understand he considers your recommendation? If the death penalty statute, if you were in the legislature and had an opportunity to vote for whether the death penalty statute should be re-

pealed or kept, how would you vote?

Ms. Jamison: Keep it.

PCR Ex. 28 at 570, 572–73.

At the beginning of the penalty phase, the judge instructed the jury:

> If the State fails to prove beyond a reasonable doubt the existence of at least one of the aggravating circumstances alleged or if you find that any mitigating circumstances outweigh the aggravating circumstances, you must not recommend the death penalty. If the State did prove beyond a reasonable doubt the existence of at least one of the aggravating circumstances alleged and you further find that such aggravating circumstances outweigh any mitigating circumstances, you may recommend that the death penalty be imposed. The law provides for the penalty of death upon conviction for the crime of murder, under circumstances. You are to consider both the aggravating and mitigating circumstances and recommend whether the death penalty should be imposed in this case, the Court is not bound by your recommendation.

9 R 2043–44. During the final instructions of the penalty phase, the judge instructed the jury:

> The law provides for the penalty of death upon conviction for the crime of murder under certain circumstances, you are to consider both aggravating and mitigating circumstances and recommend whether the death penalty should be imposed in this case. The Court is not bound by your recommendation.

9 R 2273. The judge did not give the jury any further instructions on the weight or consideration that the judge would give the jury's recommendation when he made the final decision on the sentence.

In *Caldwell* itself and other cases dealing with the role of a jury's decision or recommendation, as the case may be, closing arguments at the penalty phase have often played a decisive or central role. See, *e.g.*, *Caldwell*, 472 U.S. at 325–26, 105 S.Ct. 2633 (prosecutor's closing); *Fleenor*, 171 F.3d at 1099–1100; *id.* at 1104–05 (Ripple, J., dissenting). Against this background, it is important to note that in Lowery's trial, the prosecutor made no similar effort to diminish the jury's responsibility or otherwise to exploit the fact that Indiana law gives the judge the final sentencing responsibility. The defense counsel did not exaggerate the jury's role but properly observed that its decision was a "momentous decision," 9 R 2057, and a "monumentous [sic] burden," 9 R 2256.

Lowery acknowledges, of course, that the jury's role was to make a recommendation. He argues that the jury in his case was misled about its responsibility because it was not told how important its recommendation would be in the judge's decision or in the automatic review by the Supreme Court of Indiana of any death sentence.

Over the years since Indiana reenacted the death penalty, the Supreme Court of Indiana has repeatedly grappled with the issue of the weight that trial judges and the Supreme Court of Indiana itself must give jury recommendations for or against the death penalty. About a year before Lowery's second trial, the Supreme Court of Indiana described the jury's role in capital sentencing:

> Notwithstanding that the sentence determination by the jury is not binding upon the judge, we do not regard it as a mere formality having no substantive value. If we did, error if any, in such regard [instructing jury about terms of years] could not be other than harmless. On the contrary, the recommendation of the jury is a very valuable contribution to the process, in that it comes from a group representative of the defendant's peers, who are likely to reflect, collectively, the standards of the community.

*Brewer v. State*, 275 Ind. 338, 417 N.E.2d 889, 909 (1981).

In *Martinez Chavez v. State*, 534 N.E.2d 731, 735 (Ind.1989), the court reversed the trial judge's sentence of death imposed

after the jury recommended against it. The court stated the rule it would apply:

> In order to sentence a defendant to death after the jury has recommended against death, the facts justifying a death sentence should be so clear and convincing that virtually no reasonable person could disagree that death was appropriate in light of the offender and his crime. A trial court cannot override the jury's recommendation unless the facts meet this standard.

*Id.* at 735. Because reasonable people could differ on the appropriateness of the death penalty for the defendant in that case, the trial court was held to have erred when it overrode the jury's recommendation and the death sentence was reversed. *Id.* The Supreme Court of Indiana adhered to this view in denying rehearing, although it clarified that the reasonableness applied not to jurors as people but to their recommendation. *Martinez Chavez v. State,* 539 N.E.2d 4, 5 (Ind.1989). In two later cases, the court applied the *Martinez Chavez* standard and reversed death sentences that had been imposed contrary to jury recommendations. *Kennedy v. State,* 620 N.E.2d 17, 19–20 (Ind.1993); *Jackson v. State,* 597 N.E.2d 950, 955–56 (Ind.1992).

In *Roark v. State,* the court revisited the issue and concluded that the *Martinez Chavez* standard needed modification because it interfered with the trial court's explicit statutory authority not to be bound by the jury's recommendation. 644 N.E.2d 565, 570 (Ind.1994). The court went on to require trial courts, at the point of final decision, to "reflect upon the jury recommendation against imposing death." *Id.* The court also said, however, that in carrying out its own obligation under the Indiana Constitution to review the appropriateness of death sentences, it would still apply the *Martinez Chavez* standard. That is, during review of a death sentence where the jury had recommended against death, the Supreme Court of Indiana would not affirm a death sentence unless "all the facts available in the record point so clearly to the imposition of the death penalty that the jury's recommendation is

unreasonable." *Id.* at 571. A divided court in *Roark* reversed the death sentence despite powerful evidence supporting its imposition. The court majority found that evidence of the defendant's horrific childhood, alcoholism, drug abuse, limited intelligence, mental impairment and illness, and certain other factors would permit a reasonable decision against the death penalty. *Id.* at 573. In *Schiro v. State,* 669 N.E.2d 1357 (Ind.1996), the court adhered to the *Martinez Chavez* standard and again reversed a sentence of death imposed by a trial judge after a jury had recommended against death.

In *Peterson v. State,* the Supreme Court of Indiana apparently reached consensus on the issue:

> As part of our death penalty review we will independently consider the jury recommendation against death and determine whether the death penalty is appropriate. However, we will *not* employ a standard that requires the facts in the record to so clearly point to the imposition of the death penalty that the jury's recommendation is unreasonable.

674 N.E.2d 528, 540 (Ind.1996) (emphasis in original).

When Lowery's case was before the Supreme Court of Indiana on the *Caldwell* issue, the state court wrote:

> Neither the trial court nor the prosecutor told the jury that they were relieved of concern because the ultimate responsibility rested with the judge or this Court. *See Conner v. State,* 580 N.E.2d 214 (Ind.1991).
>
> As was the case in *Burris* and *Fleenor,* the jury here was simply informed that the responsibility for sentencing rests with the judge. In Indiana, the judge is the decision maker. The Indiana death penalty statute reads, and this Court has supported the notion that an Indiana trial court need not accept the jury's recommendation either for or against the death penalty. Ind.Code § 35–50–2–9; *Martinez Chavez v. State,* 534 N.E.2d 731, 733 (Ind.1989). The

prosecutor's comments concerning the jury's role in the death sentence determination were accurate reflections of the law in Indiana, and did not violate the principles set forth by the U.S. Supreme Court in *Caldwell v. Mississippi.*

*Lowery III,* 640 N.E.2d at 1044.

When Lowery was tried the second time, the Supreme Court of Indiana had not decided any of the cases through which the standards for review of the jury's role in death sentences were developed. Thus, if the trial judge had tried to tell the jury how much weight he and the Supreme Court of Indiana would give its recommendation, there was only the most slender chance that he would have phrased it correctly. In *Fleenor,* for example, which was also tried before that line of cases was decided, the trial judge had quoted the then-recent opinion in *Brewer v. State,* 417 N.E.2d at 909, and instructed the jury that their recommendation would be "a very valuable contribution" to the decision. See *Fleenor,* 171 F.3d at —— (quoting instructions). The Supreme Court of Indiana reviewed the challenged remarks and said they were "consistent with roles defined for judge and jury, but are not entirely accurate. They do not inform the jury that the judge is required to give due consideration to the recommendation in deciding upon the sentence." *Fleenor v. State,* 622 N.E.2d 140, 143 (Ind.1993). The court added that it would have been better if the trial judge had added some stronger statements about the importance of the jury's recommendation. *Id.* at 144.

In this case the court finds no affirmative misstatement of fact or law that might have misled the jury. As the Supreme Court of Indiana observed, the jurors were correctly informed that their verdict would be a recommendation to the trial judge. Lowery's claim, therefore, is that the jurors should have been told more—that they should have been told that a recommendation against death would have weighed so heavily that it is highly unlikely that any death sentence would be upheld. See also *Fleenor,* 171 F.3d at 1105 (Ripple, J., dissenting) (jury recommenda-

tion against death penalty "would have constituted a high hurdle for the state to overcome"). The trial judge's failure to explain to the jury a state law standard of review that was not adopted until after Lowery's trial does not support Lowery's claim of a *Caldwell* error. The statements to the jury were accurate statements of Indiana law: the jury's decision would be a recommendation, and the final decision was left to the judge. The jury was not told inaccurately that its recommendation would be given little weight.

In addition, Lowery's *Caldwell* argument overlooks, in this court's view, the totality of the circumstances the jury faced when it made its recommendation at the penalty phase. By the time the jury made its recommendation at the penalty phase, the jurors had gone through a lengthy and educational *voir dire.* The jurors had heard preliminary instructions, opening statements, evidence, closing arguments, and final instructions at the guilt-innocence phase of the trial. They had heard preliminary instructions, opening statements, evidence, closing arguments, and final instructions at the penalty phase. By the time the jury began to deliberate at the penalty phase, the jury could not have been under the impression that its role in the process was minor or trivial.

Then–Justice Rehnquist's comments in dissent in *Caldwell* itself have more force here, under a recommendation statute, than they had in *Caldwell:*

> Indeed, under the circumstances here the importance of the jury's role could hardly have been lost on the jurors themselves. The charge at the guilt phase highlighted the jurors' role as factfinders and their duty to follow the law in reaching their conclusions. The importance of their role at sentencing was evident from the charge, from the impassioned plea for mercy from petitioner's counsel, petitioner, and petitioner's mother, as well as from the prosecutor's rebuttal. It is indeed difficult to agree with the Court that a group sub-

jected to all this attention nevertheless interpreted a few remarks by the prosecutor to mean that the group's decision was no more than a sideshow—a mere "preliminary step" toward the ultimate sentencing determination.

472 U.S. at 349, 105 S.Ct. 2633 (Rehnquist, J., dissenting); accord, *Davis v. Singletary,* 119 F.3d 1471, 1482 (11th Cir.1997) (remarks about role of jury's recommendation must be considered "in the context of the entire trial"); *Waters v. Thomas,* 46 F.3d 1506, 1524 (11th Cir.1995) *(en banc )* (remarks about jury's role under jury sentencing statute must be considered in context).

Lowery's effort to paint a scene in which the jury did not appreciate the importance of its role is not persuasive. Neither the judge nor the prosecutor misstated Indiana law. The judge and the attorneys could not have predicted accurately the future evolution of the applicable standard of review. The court sees no reason to believe that the failure to explain the future standard of review depreciated the jury's sense of responsibility in the manner found constitutionally impermissible in *Caldwell.* This court finds no *Caldwell* error.

## V. *The Prosecutor's Power to Request the Death Penalty*

Lowery next claims that his right to due process of law was violated when the prosecutor requested the death penalty without the intervention of a grand jury or other neutral decision-maker. He contends that this uninsulated process subjected him "not only to death as punishment, but also ma[de] his jury more conviction prone through the process of death qualification...." See generally *Lockhart v. McCree,* 476 U.S. 162, 165, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (jurors who would refuse to impose death penalty may be excused for cause from capital case).

■■■ Under Indiana law, a prosecuting attorney has the power to file an information seeking the death penalty in a case that the prosecutor believes falls within the death penalty statute. See Ind.Code § 35–50–2–9(a) (procedure for seeking death penalty). In this case Lowery does not argue for a new broad rule requiring a prosecutor to obtain approval of a neutral decision-maker before even seeking the death penalty. As a general matter, the extensive procedural protections in a capital case, including the roles of the jury, the trial judge, and the Supreme Court of Indiana, are intended to protect a defendant from arbitrary imposition of the death penalty.

■■■ Lowery contends, however, that the prosecutor's unilateral power to seek the death penalty in this case violated his due process rights because of unique factors in this case. Prosecutor Meyers had been acquainted with Mark Thompson, knew Gertrude Thompson, and practiced law before the Thompsons' son, who then served as the circuit judge in Tippecanoe County. Lowery contends that the prosecutor exploited these relationships during argument at the penalty phase. Prosecutor Meyers argued that Lowery should suffer the death penalty and, as discussed above, stated that he knew the victims, that they were good people and everyone liked them.

■■■ Lowery relies on the general principle that a prosecutor must exercise discretion without resort to emotion or personal or professional relationships that are irrelevant in the capital sentencing decision. Pet. Reply Br. at 84, citing *Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) ("It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."), quoting *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Lowery seeks to apply here the reasoning of *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), where the Supreme Court held that racial discrimination in selecting a grand jury violated a defendant's constitutional

rights even though the grand jury's finding of probable cause had been confirmed by conviction beyond a reasonable doubt at trial: "When constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm." 474 U.S. at 263, 106 S.Ct. 617.

The evidence relevant to Lowery's argument is meager. Prosecutor Meyers testified in the post-conviction proceeding that he had known Mark Thompson since 1975, about four years before the murders. He saw Mark Thompson "frequently" in professional and social settings. He had met Gertrude Thompson a few times, probably, Meyers said, at bar dinners or similar functions. 5 PCR 1107–08. He also testified that he was acquainted with the Thompsons' son. 5 PCR 1108–09.

 Lowery is not entitled to relief on this claim. Lowery is arguing, in effect, that the federal Constitution requires a state prosecutor to recuse from a case, at least in a capital case, if the prosecutor is acquainted with the victim. Such a rule is not supported by precedent or common sense. In many parts of the country it would not be unusual for an elected county prosecutor to know a murder victim, or other crime victims for that matter. That acquaintance does not require recusal as a matter of federal constitutional law. "The authority of the prosecutor is only to *request* that the death penalty be imposed. The final decision at the trial court level is with the presiding and sentencing judge.... [T]he prosecutor has 'unfettered authority' to charge a person with a capital offense." *Resnover v. Pearson*, 754 F.Supp. 1374, 1391 (N.D.Ind.1991) (emphasis in original, quoting *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell & Stevens, JJ.)), *aff'd*, 965 F.2d 1453 (7th Cir. 1992). Because law enforcement is "a core executive constitutional function," *United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), judicial

intrusion into prosecutorial decisions is justified only when the Constitution requires it. See *United States v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). The Constitution does not require the judicial intrusion into the prosecutor's decision that Lowery seeks in this case.

The Supreme Court of Indiana found that the prosecutor's acquaintance with the Thompsons did not cause him to request the death penalty. *Lowery III*, 640 N.E.2d at 1038. It therefore found that the filing of the death penalty request against Lowery was not arbitrary, capricious, or improper. *Id.* The elaborate safeguards created by Indiana's statutory scheme stand as barriers to the arbitrary imposition of the death penalty. Those barriers prevented any deprivation of Lowery's constitutional rights in the prosecutor's decision to seek the death penalty. Lowery is not entitled to relief based on his claim that he should never have been charged with capital murder in the first place.

## VI. *Jury Instructions at the Penalty Phase*

 Under Indiana law, a jury may recommend the death penalty only if the jury finds one or more specific aggravating circumstances. See Ind.Code §§ 35–50–2–9(e), (k). Lowery contends that the jury was misinformed about this requirement. In assessing this claim, the court applies the principle that jury instructions are not to be reviewed in isolation, but rather "in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Also, in *Henderson v. Kibbe*, the Supreme Court stated that an erroneous jury instruction would be a basis for habeas relief only if the instruction "by itself so infected the entire trial that the resulting conviction violates due process." 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977), quoting *Cupp*, 414 U.S. at 147, 94 S.Ct. 396.

In this case the State charged two statutory aggravators on each count of murder: that Lowery committed the murder while attempting to commit burglary, and that Lowery had committed another murder. See 1 R 53–54; Ind.Code §§ 35–50–2–9(b)(1)(B) (attempted burglary as aggravator), –9(b)(8) (aggravator if defendant "has committed another murder, at any time, regardless of whether the defendant has been convicted of that other murder"). The State did not charge Lowery with attempted burglary as a separate offense to be tried at the guilt phase of the trial. State law did not require the prosecution to charge the aggravator felony at the guilt phase. See *Bellmore v. State,* 602 N.E.2d 111, 126 (Ind.1992).

This sets the stage for two of Lowery's claims concerning the penalty phase. The first is that the jury was not instructed that Lowery was presumed innocent of the aggravating circumstances. The second is that the court did not properly instruct the jury concerning each of the elements of the aggravator felony, attempted burglary.

■ Lowery cites no authority for the proposition that the presumption of innocence attaches to the statutory aggravator determination at the penalty phase of a capital murder case. The aggravator issue, of course, was presented not as a separate criminal offense but as part of the State's case during the penalty phase. The judge instructed the jury several times that the State was required to prove at least one aggravating factor beyond a reasonable doubt. 9 R 2043, 2045–46 (preliminary instructions at penalty phase); 9 R 2274–75 (final instructions at penalty phase). The trial court did not err by not instructing the jury that Lowery was presumed innocent of the aggravating crime. See *Bellmore,* 602 N.E.2d at 127 (concluding that absence of instruction that defendant is presumed innocent of aggravating factor does not violate due process clause).

■ As for Lowery's second claim, on the aggravator of attempted burglary, the court properly instructed the jury at the penalty phase on the elements of burglary.

The court did not give a separate instruction on attempted burglary. The trial court's failure to instruct the jury during the penalty phase on the separate offense of attempt does not entitle Lowery to relief.

■ First, as a general rule, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe,* 431 U.S. at 155, 97 S.Ct. 1730; accord, *United States ex rel. Bonner v. DeRobertis,* 798 F.2d 1062, 1067–68 (7th Cir.1986).

Second, the jury was instructed concerning the meaning and elements of "attempt" under Indiana law during the guilt phase of the trial. The court instructed: "The crime of attempt is defined by statute, as follows, a person attempts to commit a crime when acting with the culpability required for the commission of a crime, he engages in conduct that constitutes a substantial step toward the commission of the crime." 9 R 2000. Although this instruction at the guilt phase related to the charge for attempted murder of Janet Brown, the wording of the attempt instruction was general. The instruction itself did not address only the offense of attempted murder, but was a general instruction concerning the concept of attempt in criminal law.

The jury was instructed during the penalty phase that to find Lowery guilty of the statutory aggravator of attempted burglary the jury had to find beyond a reasonable doubt that Lowery intentionally killed Mark Thompson, and in turn Gertrude Thompson, while attempting to commit burglary. 9 R 2041–43. The absence of a second instruction on attempt was therefore not an omission of substance, but was rather the mere failure to give a duplicative instruction. Reviewing the instructions as a whole, the omission of a duplicative instruction on the offense of attempt at the penalty phase did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*

v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Third, the evidence was such that the jury verdict finding Lowery guilty of murdering the Thompsons made it clear "beyond a reasonable doubt" that an attempt instruction would not have affected the verdict, see Rose v. Clark, 478 U.S. 570, 583, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (applying harmless error standard of "beyond a reasonable doubt"), and that Lowery cannot show actual prejudice on this point, see Brecht v. Abrahamson, 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (applying actual prejudice standard for collateral review of trial errors); see generally United States v. Rude, 88 F.3d 1538, 1553 n. 12 (9th Cir.1996) (discussing effect of Brecht on Rose and other collateral review cases on harmless error). The circumstances under which Lowery and Bennett entered the Thompsons' home and their purpose in doing so were undisputed. Thus, once the jury determined that Lowery was inside the home (as he had plotted), there was no contested issue at the penalty phase as to the existence of the elements of attempted burglary.

█ Aside from this, a trial court need not define terms that fall within the common understanding of a juror, even if the term constitutes an essential element of the crime charged. United States v. Durades, 929 F.2d 1160, 1168 (7th Cir.1991), citing United States v. Lignarolo, 770 F.2d 971, 980 (11th Cir.1985). Lowery's contention that the jury was permitted to find a statutory aggravator on any basis other than the existence of proof beyond a reasonable doubt is refuted by the trial court's extensive instructions.

In Lowery II, the Supreme Court of Indiana found:

> The trial judge ... thoroughly and adequately instructed the jury, pursuant to Ind.Code § 35–50–2–9 (Burns Rep.1979), how they were to weigh the evidence and determine whether to recommend the death sentence. Further, the trial judge instructed the jury, more than once, that before they could return a recommendation of death they must make a finding that the State proved at least one of the aggravating circumstances beyond a reasonable doubt. He specified that if they did not find at least one aggravating circumstance existed beyond a reasonable doubt, they could not recommend the death penalty. He also stated that if they found at least one aggravating circumstance existed beyond a reasonable doubt, then they could recommend the death penalty.... Clearly, the jury was instructed that before they could return a recommendation of death on the appropriate form the trial judge had given them, they were required to make findings beyond a reasonable doubt.

Lowery II, 478 N.E.2d at 1230. The instructions given at the penalty phase did not, as Lowery claims, relieve the State from its burden of proving each alleged statutory aggravator beyond a reasonable doubt. Lowery is not entitled to relief on this claim.[6]

## VII. Consideration of Sentencing Factors

█ The Supreme Court has explained that as long as the final sentencer's discretion is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action," Zant v. Stephens, 462 U.S. at 874, 103 S.Ct. 2733, quoting Gregg v. Georgia, 428 U.S. at 189, 96 S.Ct. 2909 (opinion of Stewart, Powell & Stevens, JJ.), the court or jury "is free to consider a myriad of factors to determine whether death is the appropriate punishment." California v. Ramos, 463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). Unlike a trial, which is focused on the single issue of guilt, the sentencing

---

6. The court also disagrees with Lowery's further suggestion that the prosecutor's arguments at the penalty stage invited the jury to find the alleged statutory aggravator of attempted burglary on the basis of Lowery's character or on any basis other than the evidence.

phase is a multifaceted inquiry in which "there is no single determinative issue apart from the general concern that the penalty be tailored to the individual defendant and the offense." 463 U.S. at 1009, 103 S.Ct. 3446; see also *Zant v. Stephens,* 462 U.S. at 878, 103 S.Ct. 2733. Determining a death sentence demands individualized consideration of mitigating circumstances. The sentencer—whether jury or judge—must consider all relevant mitigating evidence. *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

Lowery claims that his rights to due process, to a reliable and individualized sentencing determination, and to meaningful independent appellate review were denied "when the sentencing judge failed to consider mitigating evidence, and, in fact, found that none was present; when the trial court found aggravating circumstances that were not available to him; and when the [Supreme Court of Indiana] conducted its review of Lowery's sentence on direct appeal and from the denial of post-conviction relief."

 Lowery first argues that the trial judge's explicit recitation of certain aspects of the mitigating evidence shows that the trial judge did not consider the evidence he did not specifically mention. See 9 R 2303–07. This reasoning is not persuasive. As explained in *Prudential Insurance Co. v. Benjamin,* 328 U.S. 408, 418, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946):

> More often than not, in matters more governable by logic and less by experience, the business of negative implication is slippery. Into what is thus left open for inference to fill, divergent ideas of meaning may be read much more readily than into what has been made explicit by affirmation.

Indiana law requires the sentencing judge to provide reasons for selecting the death penalty. It does not require the sentencing judge to issue findings of fact on each

statutory mitigator or on each aspect of a non-statutory mitigator addressed in the evidence. In this case, the trial judge's explanation of the sentence showed that he considered the evidence at the penalty phase. A more extensive statement was not required for a meaningful review of his reasons.

 The trial court found that no mitigating circumstances were present. This finding does not imply the failure to give meaningful consideration of the evidence supporting the existence of such factors. *Dobbert v. Strickland,* 718 F.2d 1518, 1524 (11th Cir.1983) ("The fact that the sentencing order does not refer to the specific types of non-statutory 'mitigating' evidence petitioner introduced indicates only the trial court's finding the evidence was not mitigating, not that such evidence was not considered.").

 The presence or absence of mitigating factors is a matter on which a state's findings should be accepted in the course of federal habeas review. *Eddings v. Oklahoma,* 455 U.S. 104, 113–15, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). A court's statement that it did consider all evidence in determining whether any mitigating factors existed is ordinarily sufficient. *Jeffers v. Lewis,* 38 F.3d 411, 415 (9th Cir. 1994). A court is deemed to have taken into account all mitigating evidence where the court so states. *Parker v. Dugger,* 498 U.S. 308, 314–15, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). The record shows that the trial court gave such consideration and recognized the pertinent evidence.[7]

Lowery's second claim is that the trial court erred by considering aggravating factors in violation of State law. In explaining the death sentence, the trial court referred to Lowery having been convicted of another murder as a statutory aggravator. A conviction of another murder is indeed a statutory aggravator. Ind.Code § 35–50–2–9(b)(7). The reference did not

---

7. Whether the trial court's findings were "adequate" under Indiana caselaw or under the Indiana statute would not be an issue cognizable under 28 U.S.C. § 2254(a). See *Del Vecchio v. Illinois Dep't of Corrections,* 31 F.3d 1363, 1370 (7th Cir.1994).

fit this case, however, because at the penalty phase in Lowery's second trial Lowery had not yet been *convicted* of the murders of either Mark Thompson or Gertrude Thompson because judgment had not yet been entered. See *Thompson v. State,* 492 N.E.2d 264, 270–71 (Ind.1986). The relevant aggravator in this case was the charge that Lowery committed each murder while *committing* the other murder. See Ind.Code § 35–50–2–9(b)(8).

The trial judge was restricted to considering the same statutory aggravators as was the jury, *Lowery III,* 640 N.E.2d at 1046, so the trial judge erred when he referred to aggravator (b)(7) (convicted of another murder) instead of (b)(8) (committed another murder), which was the statutory aggravator alleged and considered by the jury. The Supreme Court of Indiana concluded that the judge's reference to Lowery having been convicted of another murder was actually a reference to the statutory aggravator which had been alleged in Lowery's case, which was that Lowery had committed another murder: "[W]e are convinced that the judge, after reading the 'commission of another murder' aggravators in the death sentence allegations of the charge, and after instructing the jury on the 'commission of another murder' aggravator, did apply that same aggravator as had the jury, although he misspoke." *Id.* That evaluation was plainly correct. It defies belief to suggest that the trial judge was actually confused on this point.

Lowery also argues that his constitutional rights were violated when the sentencing judge said that he found Lowery "committed these murders intentionally killing victims while attempting to rob them and that you acted out of motive for pecuniary gain." 9 R 2302. The aggravating factor in the charge was that Lowery committed the murders in the course of a burglary, as distinct from a robbery, and Lowery argues that the judge's misstatement on this point violated his constitutional rights. In *Lowery II,* the Supreme

Court of Indiana found the argument to have been without merit:

> [B]urglary is the breaking and entering of a building or structure of another with intent to commit a felony therein. Ind.Code § 35–43–2–1 (Burns Repl. 1979). It is apparent and clear here that Defendant entered this property with intent to commit the felony of robbery. That is what he was doing at the time he committed these murders. He went there with the express purpose of obtaining money and property from the Thompsons. Even after he had committed the crimes and the alarm was sounding, he expressed a desire to continue finding something to take with him. The only thing that prevented him was fear he would be caught. We see no error on this issue.

478 N.E.2d at 1231. This court agrees with that evaluation of the trial judge's reference to robbery rather than burglary.

Adding a new twist to the same issue, Lowery also argues that the treatment of this issue by the Supreme Court of Indiana shows that the court did not conduct an adequate review and assessment of all the circumstances in the face of the trial court's errors. This court disagrees. The Supreme Court of Indiana's treatment of the misstatement confusing conviction of another murder with commission of another murder and the reference to robbery rather than burglary is not the "invalidation" of an improperly considered aggravator as argued by Lowery, nor as contemplated in decisions such as *Clemons v. Mississippi,* 494 U.S. 738, 744–45, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), and *Stringer v. Black,* 503 U.S. 222, 226–27, 231, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992).

Even if the discussion of these misstatements amounted to an invalidation of the trial judge's consideration of a statutory aggravator that was mislabeled, the Supreme Court of Indiana in *Lowery II* left no doubt concerning its independent as-

sessment of the evidence and the sentences:

> An examination of the entire record, pursuant to our responsibility to review the imposition of the death penalty, clearly supports the conclusion that imposition of the death penalty was appropriate, considering the nature of the offense and the character of the defendant. As this opinion already amply demonstrates, there was proof beyond a reasonable doubt that this defendant intentionally killed the Thompsons. He expressed animosity toward them because of his prior relationship with them and further expressed a desire and intent to get money and property from them. The trial judge told the defendant during sentencing, "I can find no factor that mitigates in your favor in this case. You have nothing going for you except a brutal cold blooded pre-planned killing of old people." (Record at 207). At another point he stated, "There are no, there is no justification and not even the wildest theorist can provide the justification for what you did under any circumstances of logic or reason." (Record at 205). The record patently shows the egregious nature of these offenses and the character of this offender. The trial court carefully complied with the proper procedures pursuant to statute and case law, and we find that the imposition of death, recommended by the jury and imposed by the trial court, was not arbitrarily or capriciously arrived at and is reasonable and appropriate.

*Lowery II*, 478 N.E.2d at 1231–32. The Supreme Court of Indiana has given Lowery's case repeated and careful attention. Its handling of his case did not violate his federal constitutional rights.

## VIII. *Assistance of Trial Counsel*

Lowery also claims that he was denied his right to the effective assistance of counsel at the second trial during both the guilt phase and the penalty phase.

■ The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Thus, 'the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.' " *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), quoting *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

■ To show ineffective assistance of counsel, Lowery must show that (1) his attorneys' representation was deficient, and (2) the deficient performance so prejudiced his defense that the results of the proceedings against him were "fundamentally unfair or unreliable." *United States v. Kellum*, 42 F.3d 1087, 1094 (7th Cir. 1994), citing *Lockhart*, 506 U.S. at 369, 113 S.Ct. 838, and *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. The absence of either prong defeats the ineffectiveness claim. *Strickland*, 466 U.S. at 700, 104 S.Ct. 2052; *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir.1996); *MacDougall v. McCaughtry*, 951 F.2d 822, 825 (7th Cir.1992).

■ Under the first prong, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Only those "who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ." *Kimmelman v. Morrison*, 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. The second prong, prejudice in the *Strickland* sense, refers to "unprofessional errors" so egregious "that the trial was rendered unfair and the verdict rendered suspect." *Eddmonds v. Peters*, 93 F.3d at 1313, quoting *Kimmelman*, 477 U.S. at 374, 106 S.Ct. 2574. The court now turns to Lowery's specific complaints about his trial counsel.

A. *Identification Testimony.* Lowery first contends that trial counsel were ineffective because they failed to challenge the admissibility of Janet Brown's identification of him as the murderer when she examined an array of photographs in the hospital shortly after the murders. Lowery also contends counsel were ineffective because they failed to impeach Brown with a prior inconsistent identification.

The second point can be dismissed quickly. In Lowery's first trial, his counsel showed Brown a photograph. It was a picture of Bennett, not Lowery. Brown said: "It's not a very good picture. It looks like James Lowery's eyes, but it's not a very good picture of him." OR 448. Brown testified at the second trial that her identification was based on the "eyes" of the murderer. 5 R 1051.

■ As "impeachment" of Brown's identification of Lowery as the murderer, this is pretty thin stuff. The evidence from the post-conviction proceeding shows that Lowery's lawyers reasonably concluded for purposes of the second trial that use of the prior testimony on the poor-quality picture of Bennett was likely to backfire on the defense. See 8 PCR 1929–30 (defense counsel concluded the original misidentification had been a lucky mistake and that if Brown did not repeat the mistake at the second trial, "it was something that would come back to haunt the defense").

Because of the poor quality of the photograph, the prosecution could easily have attacked the incident as a trick that would undermine the defense case. The prosecution would also have been able to argue that Brown did not actually fall for the trick (limiting her comment to the eyes looking like Lowery's), and also would have been able to "rehabilitate" her testimony by having her go through her prior identifications and the bases for them. In addition, the whole exercise would have brought more attention to the prior trial, which would have been inconsistent with counsel's efforts to avoid or minimize such references. See 4 R 835 (granting defense motion *in limine* to exclude references to

prior trial). Lowery's trial counsel's decision on this issue was certainly reasonable and cannot seriously be called ineffective. It was a tactical decision that counsel made within the bounds of professionally competent representation.

■ Whether counsel were ineffective for failing to try to exclude all of Brown's identification testimony is a more involved question, but the result is the same. Lowery's counsel were not ineffective on this point. Two days after the murders, police and prosecutors visited Janet Brown in the hospital. They showed her four or five photographs and asked her if she knew anyone in the photographs. She recognized a photograph of Lowery. 5 R 1057–58. Brown also made an in-court identification of Lowery during the second trial. 5 R 1017–18.

Lowery's counsel did not attempt to have Brown's hospital identification of Lowery suppressed. Lowery contends this was deficient performance, especially in light of Brown's testimony at the original trial about the bad picture of Bennett. Lowery emphasizes here that Brown had a limited opportunity to view the perpetrators at the Thompsons' trailer on September 30, 1979. The evidence shows, however, that Brown had ample opportunity to see Lowery the night of the murders. Moreover, this was not an identification of a stranger by a traumatized witness. The night of the murders, Brown already knew Lowery (although not by name). She made repeated statements to police officers the night of the killings that showed she recognized the killer as the man she had met and talked with at the post office a week or so earlier about motorcycles and the Thompsons.

The identification of Lowery through Brown's eyewitness testimony was without question an important part of the State's case. The likelihood of Brown's hospital identification of Lowery having been suppressed due to constitutional infirmity of the identification can be assessed by reference to the review of the applicable stan-

dard in *McGowan v. Miller,* 109 F.3d 1168, 1173 (7th Cir.1997):

> In *Stewart v. Duckworth,* 93 F.3d 262 (7th Cir.1996), we recently reaffirmed the test we apply to a challenge to pretrial identification procedures:
>
> > The constitutionality of a challenged pretrial identification procedure is analyzed in two steps. First, the court must determine whether the procedure was "unnecessarily suggestive." Even if the procedure was "unnecessarily suggestive," the identification may still be admissible if "under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In analyzing the totality of the circumstances, courts consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by witness at the confrontation, and the length of time between the crime and the confrontation." *Id.*
>
> 93 F.3d at 265. "Whether a pretrial identification procedure is unduly suggestive and whether a witness's subsequent identification is nonetheless reliable under the totality of the circumstances are two separate inquiries that should be approached sequentially[.]" *United States v. Johnson,* 859 F.2d 1289, 1294 (7th Cir.1988).

The decision of Lowery's attorneys not to seek to suppress Brown's hospital identification was not professionally deficient because there was no sound basis for suppressing the identification. The procedures used in the hospital were not unduly suggestive. Even if they had been unduly suggestive, the totality of the circumstances shows that Brown's identification was reliable. These circumstances include the fact that Brown had met Lowery a week before the murders and had talked with him at some length, so that she recognized him the night of the murders as the same person before she ever saw the photographs in the hospital.

■ Even if the decision not to challenge Brown's hospital identification had been professionally deficient, and it was not, the failure to challenge her identification was not prejudicial to Lowery in the sense contemplated by *Lockhart,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180. That is, the introduction of Brown's extrajudicial identification of Lowery did not result in a trial that produced a fundamentally unfair and unreliable result. Brown's identification of Lowery was corroborated by Bennett's testimony, Lowery's own incriminating statements, and the various lines of corroborative evidence. Accordingly, the failure to seek suppression of Brown's hospital identification of Lowery did not prejudice Lowery. Absent prejudice, Lowery cannot prevail on a claim of ineffective assistance of counsel.

■ B. *Testimony of James Bennett.* In a reprise of his confrontation clause argument, Lowery argues that his lawyers failed to provide effective assistance of counsel by failing to take steps to force the State to make Bennett testify at the second trial. The court has already reviewed the circumstances above. Framing the same arguments in terms of attacks on his attorneys adds nothing to his claims. The court has already determined that there was no violation of the confrontation clause in the admission of Bennett's prior testimony. Lowery's attorneys hold no responsibility whatever for the State's failure to be even more aggressive in securing Bennett's live testimony at the second trial.

■ Lowery also argues that his lawyers were ineffective because they failed to offer evidence of letters and other statements by Bennett that were inconsistent with or otherwise impeached his testimony from the first trial. For example, Bennett had written letters to the Thompsons' son and to the Governor of Indiana claiming

that he had not known what was happening the night of the murders and that he had been high on drugs (diet pills). See 8 PCR 1759–60, 1765–66. Bennett had also written letters to Lowery himself suggesting that a third person had been present for the murders and claiming that the police had beaten him and threatened him with a shotgun to obtain an incriminating statement. 8 PCR 1777–78, 1779–80.

In response, the State argues that the failure to use this impeaching evidence caused Lowery no prejudice. The court agrees. The jury already had ample reason to be skeptical about Bennett's testimony. They were aware of Bennett's plea agreement, and they saw him refuse to testify and saw the judge hold him in contempt of court at the second trial. Most important, however, is that despite all the impeaching evidence—used and not used—Bennett's testimony on the critical points was corroborated. It was corroborated by the testimony of Janet Brown, the testimony of Lowery's ex-wife, and by Lowery's own incriminating statements to police officers. Bennett's testimony was also corroborated at the penalty phase when Lowery admitted on cross-examination that he had shot and killed Mark and Gertrude Thompson. Lowery's lawyers' failure to use available evidence to impeach Bennett did not render the outcome of the trial unreliable or unfair.

C. *Prosecutorial Misconduct.* Lowery contends that the prosecuting attorney engaged in misconduct during opening statements and closing arguments of the guilt phase. He argues here that his attorneys rendered ineffective assistance by failing to "stop and prevent the prosecutor from urging the jury to convict Lowery upon improper and irrelevant reasons." The full inventory of these contentions is this:

Defense counsel permitted the prosecutor to argue that the jury should find Lowery guilty for irrelevant and inappropriate reasons. The prosecutor argued that despite the presence of the jury and judge, they would see fear in the courtroom because of Lowery. He sought to inflame the passions and fears

of the jury by referring how this case had affected his life; how helpless, harmless and defenseless the victims had been; and how Lowery was like infamous murderers such as "Drollinger" and "Manson." And, the prosecutor was permitted to argue that constitutional safeguards like the presumption of innocence did not apply to Lowery because he was actually guilty. Finally, the prosecutor was allowed to argue that the jury should find Lowery guilty to insure the safety of the people of Indiana. There is a reasonable probability that these improper lines of argument affected the jury, and had defense counsel objected, the results of the guilt phase would have been different. Likewise, there is a reasonable probability that result of the penalty phase would have been different had defense counsel objected to these lines of argument.

Petition at 12. The connection of Lowery's attorneys to these asserted instances of prosecutorial misconduct is that the attorneys either failed to object or, if they did object, failed to persuade the trial court of the merit of their objections.

■ To the extent that Lowery's counsel failed to object to the prosecutor's arguments, the potential two-fold harm to Lowery would arise from (1) the waiver of challenges to prosecutor misconduct asserted in subsequent proceedings, and (2) the denial of a fair trial from the prosecutor's arguments. The first category of harm has been removed from the picture, however, because the Supreme Court of Indiana found that none of the claims of prosecutorial misconduct had been waived by the absence of an adequate objection. *Lowery III,* 640 N.E.2d at 1037–38. Moreover, as explained above with respect to Lowery's direct charges of prosecutorial misconduct, the incidents were not so serious as to deprive Lowery of a constitutionally fair trial. As a result, these alleged failures of counsel caused no prejudice to Lowery. The absence of prejudice defeats a claim of ineffective assistance of counsel.

*MacDougall,* 951 F.2d at 825. In evaluating the impact of attorney errors on the verdict, courts must keep in mind that the "ultimate objective [of our legal system is] that the guilty be convicted and the innocent go free." *Evitts v. Lucey,* 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), quoting *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).

D. *Jury Instructions at the Guilt Phase.* Lowery also contends that his attorneys failed "to tender complete and proper instructions during the guilt phase regarding the elements the State was required to prove beyond a reasonable doubt."

 This specific contention was not included in Lowery's direct appeal from the second trial, nor in his appeal from the denial of post-conviction relief. Lowery does not renew the contention in his reply to the respondent's return to order to show cause. Procedural default "occurs when a claim could have been but was not presented to the state court and cannot, at the time that the federal court reviews the habeas petition, be presented to the state court." *Resnover v. Pearson,* 965 F.2d 1453, 1458 (7th Cir.1992). Lowery has not shown circumstances suggesting that the merits of this specification must be examined despite his procedural default.

 E. *Evidence Submitted at the Penalty Phase.* Lowery's counsel presented evidence at the penalty phase that was calculated to humanize him. His lawyers presented evidence from Lowery's mother, father, and brother, and from a psychiatrist and a physician who had examined him. In addition, Lowery himself took the stand. Lowery's lawyers told the jury in the opening statement at the penalty phase that they wanted to show that Lowery "has a soul worth redeeming." 9 R 2056. His lawyers said they would be waiving attorney-client and doctor-patient privileges in an effort "to lay Jim Lowery out for you from the witness stand." *Id.* In their closing arguments at the penalty phase, Lowery's lawyers argued that they and Lowery himself had been candid with the jury. 9 R 2257–59, 2261–63.

Some of the information brought out by the defense in the penalty phase was damaging to Lowery. The testimony of Dr. John R. Porter and a deposition and written report from Dr. Stuntz included Lowery's admission that he had participated in the murders. The prosecution used Dr. Stuntz's report in arguing that the jury should recommend the death penalty, including Lowery's statements to Dr. Stuntz that he was not remorseful about the murders. See 9 R 2239–45. Lowery's parents testified at the penalty phase, but their testimony at that point, as compared to the testimony at the post-conviction proceeding, tended to justify their own actions in raising Lowery and not to accept some degree of responsibility for serious problems in his upbringing.

In addition, Lowery himself testified in the penalty phase. In response to the first three questions on cross-examination, Lowery admitted he murdered the Thompsons:

Q Did you get blood on you when you shot Mrs. Thompson?

A No blood, no. I thought there was. But, there, evidently there wasn't.

Q How about when you shot Mark?

A No. The only, there is only one person, to the best of my knowledge that had any blood on them that night because of an incident which took place later, and I, I sincerely and truly believe that Jim Bennett did have blood on him. Because Barbara is the one that washed his clothes. He gave her the clothes and she washed them.

Q You said that it was Bennett's idea to waste them?

A When you had Mr. Bennett here on the stand and with what he was saying, like I said, I sat there and listened to the lies, that were being told, not only by Bennett and Bar-

**1116**

bara, but some lies that were told by police officers and there was nothing I could do at that point, except sit there and listen. Bennett knew before anything happened, *I wound up as the trigger man,* but, in reality, he would be the trigger man when we got up there. I was the back up man. That's why he had the shotgun shells in his pockets.

9 R 2196–97 (emphasis added); see also 9 R 2199–2202 (Lowery describing murders). Lowery also repeated on the witness stand his lack of remorse for murdering the Thompsons. 9 R 2202.

Lowery's current lawyers argue that the presentation of evidence at the penalty phase was even worse than a lawyer's complete failure to present evidence in mitigation. His current lawyers also point out that "trial counsel allowed Jim Lowery's version of the killings to be brought out *completely on cross-examination;* no questions were asked of him on direct regarding how these killings occurred." Pet. Reply Br. at 80 (emphasis in original). Lowery's current lawyers further argue that his trial lawyers failed to prepare him adequately for testimony and cross-examination and failed to present available information that could have helped the jury understand the damaging evidence they heard.

In fact, the defense evidence did include some explanations. The jury heard about Lowery's previous hospitalizations in state mental hospitals, his suicide attempts, as well as his report to Dr. Stuntz about family difficulties, poverty, alcoholism, and abuse as he was growing up. As for Lowery's own testimony, there are limits to what lawyers can accomplish with their clients and the facts. Lowery's lawyer testified that he recalled Lowery showing remorse in their sessions preparing him for his testimony. 9 PCR 2115. Lowery's "performance" on the stand obviously did not go as his lawyers hoped, but Lowery cannot blame his lawyers for that.

At the post-conviction hearing, Lowery's attorneys showed that his trial lawyers could have developed and submitted additional biographical and character evidence, such as his reported kindness to children, including his brothers and sisters as they grew up in difficult circumstances. The Supreme Court of Indiana found that this new evidence would have been "cumulative" to the evidence actually submitted at the penalty phase. *Lowery III,* 640 N.E.2d at 1048 ("While appellant's trial counsel should have included the omitted testimony, we do not believe that these omissions rose to the level of ineffective assistance of counsel. The evidence itself was repetitious and already before the jury and the judge. [Lowery's] counsel exercised his discretion in choosing to exclude the testimony. The claim of ineffective assistance of counsel during the penalty phase of the trial was properly rejected."); see also *United States v. Schaflander,* 743 F.2d 714, 718–19 (9th Cir.1984) (failure to present cumulative testimony does not show prejudicial ineffective assistance).

This court agrees with the Supreme Court of Indiana that the additional information would have supplemented evidence the jury and judge actually heard on the same general topics. Also, in light of Lowery's current complaints about the damage done during cross-examination of the witnesses he did present, one can fairly wonder whether presentation of additional evidence in mitigation would have given the prosecution more opportunities for damaging cross-examination to reinforce its arguments for the death penalty.

After an attempt to show mitigation at trial has failed and the defendant has been sentenced to death, it is always possible—indeed it is commonplace—for a new team of lawyers to show that the original lawyers could have dug deeper, could have presented something more to support their theory. It is also possible for the new team of lawyers to argue that the evidence actually presented at trial was in fact prejudicial. Lowery has made both types of arguments here. After the defendant has

been sentenced to death, it is easy to argue that the unsuccessful strategy was constitutionally ineffective. After all, the results could not have been any worse.

This case presents that type of exercise. Lowery's present counsel have shown that his trial lawyers could have presented more extensive evidence in mitigation to the jury at the penalty phase. They have also argued that some of the evidence presented was harmful to Lowery rather than helpful. That is not the test for ineffective assistance of counsel:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle v. Isaac,* 456 U.S. 107, 133–34, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct, from counsel's perspective at the time. Because of the difficulties inherent in making that evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See *Michel v. Louisiana, supra,* [350 U.S.] at 101[ 76 S.Ct. 158, 100 L.Ed. 83 (1955)]. There are countless ways to provide effective assistance in any given case.

*Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; accord, *United States v. Hirschberg,* 988 F.2d 1509, 1513 (7th Cir.1993) ("In instances when defendants attack trial counsel's strategy choices, we offer enormous deference to those choices, and we do not rely on the 'perfect vision of hindsight.' "), citing *United States v. Phillips,* 914 F.2d 835 (7th Cir.1990).

Lowery's lawyers at trial undertook a strategy that carried significant risks. The strategy obviously was not successful. Nevertheless, they had a strategy, and Lowery has not overcome the presumption that his lawyers acted within the broad range of reasonable professional conduct in trying to persuade the jury not to recommend death. Lowery is not entitled to relief based on his lawyers' presentation of evidence at the penalty phase.

F. *Role of the Jury in "Recommendation" at the Penalty Phase.* Lowery also contends that his attorneys were ineffective at the penalty phase when they failed to prevent misstatements of the law by the judge and the prosecutor regarding the jury's role in making a recommendation to the judge about the death penalty or life imprisonment. The court has concluded above that there were no such misstatements and that there was no constitutional error in the statements of the judge or the prosecutor. Lowery's lawyers did not provide ineffective assistance of counsel in this respect.

G. *Jury Instructions at the Penalty Phase.* Lowery's final specification of attorney error at his trial is that his attorneys "failed to tender complete and proper instructions regarding the nature, definition and function of mitigating circumstances, as well as the requisite elements of proof required for a finding of the aggravating circumstance of intentional killing while attempting to commit burglary." As explained in addressing Lowery's separate challenge to the instructions at the penalty phase, Lowery has not shown that the trial court's instructions violated his federal constitutional rights. As a result, his lawyers' efforts along these lines did not amount to constitutionally ineffective assistance of counsel.

In sum, the situation with respect to Lowery's claim of ineffective assistance of counsel at trial is this: "The essence of an ineffective assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and

prosecution that the trial was rendered unfair and the verdict rendered suspect." *Lewis v. Lane*, 832 F.2d 1446, 1452 (7th Cir.1987), quoting *Kimmelman*, 477 U.S. at 374, 106 S.Ct. 2574. Lowery's second trial was not distorted in this fashion based on the representation he received. He is not entitled to relief on this claim.

### IX. *Performance of Appellate Counsel*

Finally, Lowery contends that he was denied his right to effective assistance of counsel on appeal. The claim is based on his counsel's failure to include in the record on direct appeal in *Lowery II* a transcript of the jury voir dire. Lowery had asked the trial court to conduct separate *voir dire* of each prospective juror because of the publicity associated with the first trial. The trial court concluded that an individualized, sequestered jury *voir dire* was not warranted, and hence conducted the *voir dire* with groups of prospective jurors who could hear one another's answers.

In *Lowery II*, Lowery argued that he was denied a fair trial because of prejudicial publicity before the second trial. He made the argument, however, without the benefit of the transcript of the actual *voir dire*. The Supreme Court of Indiana found the argument unpersuasive because Lowery had failed to show prejudice. *Lowery II*, 478 N.E.2d at 1221. Lowery now contends there is a reasonable probability that if the transcript of the *voir dire* had been presented in that appeal, the result on appeal would have been different because he "could have established the prejudice which the state supreme court requires to be shown in order to show an abuse of discretion in denying a motion for individual voir dire in a capital case."

In addition to finding that Lowery had failed to show prejudice from the *voir dire* process, the Supreme Court of Indiana recounted in *Lowery III* the circumstances (examined in the postconviction proceeding) surrounding the decision not to proceed with the argument in *Lowery II*, knowing that this decision accounted for the absence of a transcript of the *voir dire:*

It appears from the record that Freund [Lowery's appellate attorney in *Lowery II*] did review the trial record, including the alleged anomaly in the jury selection process. Freund made a strategic decision not to pursue the "death qualification" issue. Freund also concluded that the issue, if it existed, was unavailable, because appellant's trial attorney had not raised it in appellant's motion to correct errors. The evidence appellant presents conflicts with the evidence supporting Freund's actions. The post-conviction court logically concluded that Freund acted competently and provided effective assistance of counsel.

*Lowery III*, 640 N.E.2d at 1048–49.

Lowery argues that the state court's references to strategic decisions are not fairly supported by the record. His appellate counsel testified that he was focusing on a different argument on the failure to conduct separate, individual *voir dire*, arguing that having jurors hear one another answer that they were willing to consider the death penalty would unfairly poison the panel. See 5 PCR 1225–30. Appellate counsel concluded that he did not need a transcript of *voir dire* to establish the *per se* argument on that point. Appellate counsel did not focus on the issue of juror comments on publicity in open court, with other prospective jurors present.

Under *Strickland*, petitioner Lowery must show both that his lawyer failed to perform competently and that the failure caused prejudice to him. Even if the state court's treatment of the performance issue is not supported by the record (which this court does not decide), Lowery still has not shown that he was prejudiced. The transcript of *voir dire* has been prepared as Exhibit 28 in the PCR record. The record shows some pretrial publicity that mentioned the fact that the case was being retried, and that publicity included the information that Lowery had previously been sentenced to death. See PCR Ex. 28 at 350–51. But Lowery has identified

only one specific instance of a prospective juror's comments about publicity.

The judge was asking prospective jurors about exposure to publicity, and he had told the jurors not to repeat what they had read or seen or heard. "You can't mention that in the court room." PCR Ex. 28 at 42–43. But a moment later the judge called on Juror Gains. She responded: "I read in the Flyer or the Guide one of the (inaudible) trial was gonna be retried." PCR Ex. 28 at 44. The judge responded: "A new, a new trial date. Of you four who have talked [about having seen any publicity], have you formed an opinion in this case, any of you? Negative response there." *Id.* The judge then asked each of those four about their ability to set aside whatever they might have come across in the newspaper and to decide the case based on the law and evidence in the courtroom. *Id.* at 44–48. A little while later, Juror Gains was excused. *Id.* at 56.

This one mention that a prospective juror had read that the case was a retrial falls well short of showing that Lowery was denied a fair trial, and thus that his appellate counsel's failure to obtain the transcript of the *voir dire* caused him any prejudice. The juror's comment drew no immediate response from anyone, no reminder from defense counsel to the judge about the need to separate prospective jurors or to question other jurors about whether they had heard what Juror Gains had said. Any finding of prejudice on this issue would rest on sheer speculation. Lowery is not entitled to habeas relief on the theory that his appellate counsel rendered ineffective assistance of counsel.

*Conclusion*

Petitioner Lowery's convictions for murdering Mark and Gertrude Thompson and his death sentences for those crimes were not the result of any violation of Lowery's rights under federal law. His petition for a writ of habeas corpus is therefore DENIED and this cause of action is DISMISSED WITH PREJUDICE. This court's previous stay of execution is VA-CATED. The court will enter final judgment immediately.

So ordered.

**FINAL JUDGMENT**

The court, having this day made its Entry on the petition for a writ of habeas corpus, it is hereby ORDERED, ADJUDGED, AND DECREED that petitioner Jim Lowery take nothing by his petition for a writ of habeas corpus, that this action is dismissed with prejudice, and that the stay of execution previously entered in this action is VACATED.